Ginger G. Mooney, OSB # 031261
Ginger G. Mooney, LLC
1017 May Street, Suite 200
Hood River, Oregon 97204
(541) 716-5650
Fax (503) 389-1585
contact@mooneylaw.org
Attorney for Maria Molina

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **MARIA MOLINA,** | USDC Case No. 2:20-cv-1195 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **COLETTE PETERS**, Oregon Department of Corrections (ODOC); **BRIAN BELLEQUE**, ODOC Deputy Director (past); **HEIDI STEWARD**, ODOC Deputy Director (current); **PAULA MYERS**, Superintendent Coffee Creek Correctional Facility (CCCF); **MICHAEL GOWER,** ODOC Assistant Director of Operations; **ROB PERSSON,** ODOC Westside Institutions Administrator; **ERICKA SAGE**, ODOC PREA Coordinator; **DAWNELL MEYER**, ODOC Behavioral Health Services Administrator; **RICHARD STEPHEN ALBERTS, JR.,** ODOC Correctional Officer; **JASON BATTIN**, ODOC Correctional Officer; **MICHAEL YANEZ**, ODOC Correctional Officer; **SHERRI KILGORE**, ODOC Correctional Officer; **ANTHONY ROSS**, ODOC Correctional Officer; **JACK ROWLETT**, ODOC Correctional Officer; **TANYA SIMMONS**, ODOC Correctional Officer; **JENNIFER ELGIN**, ODOC/CCCF counselor; **T. PLUMBER**, ODOC SUI Investigator; **ALEX DORAN**, Correctional Officer; **JASON WILSON,** Correctional Officer; **SHANNON MECHAM,** | 42 U.S.C. §§ 1983, 1985 (Violation of Civil Right under Color of Law), Eighth Amendment Failure to Protect, Failure to Supervise, PREA Violations, Fourteenth Amendment Due Process, Injunctive Relief

**DEMAND FOR JURY TRIAL** |

1   – COMPLAINT

Correctional Officer; **MICHAEL S
CRANFORD,** Correctional Officer;
**JOHN/JANE DOE**, ODOC/ SIU
Investigators; **JOHN/JANE DOE**,
ODOC/CCCF Correctional Officers;
**JOHN /JANE DOE,** Security Staff; **JOHN
/ JANE DOE**, ODOC Medical Staff; and
State of Oregon, each sued in their
individual and official capacities,

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff by and through her attorneys, brings her complaint herein. Plaintiff states and alleges as follows:

## INTRODUCTORY STATEMENT

## 1.

This is a civil rights action brought by plaintiff, Maria Molina, in which she seeks relief for the defendants' violations of her rights secured by the United States Constitution, including the First, Eighth and Fourteenth Amendments, by the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985.

Plaintiff, a vulnerable person, was an inmate in Coffee Creek Correctional Facility (CCCF), an Oregon Department of Corrections (ODOC) facility, until January 2020. Plaintiff is currently housed at the Grant County Jail as an ODOC inmate. Plaintiff was sexually assaulted, harassed and used by Correctional Officers (CO). Defendant failed to provide adequate supervision and training of staff. ODOC further failed to provide adequate safeguards and protections for plaintiff from defendants Alberts and Battin, Correctional Officers who attempted to or raped, sexually harassed and intimidated Plaintiff and, to our knowledge, another female inmate between 2018 until 2020 while employed at CCCF. Defendants failed to recognize and respond to obvious signs

defendant Alberts was grooming female prisoners and had a pattern of sexual predation which was known to many staff members, including other correctional officers on the unit, security staff, and management at CCCF. Defendants failed to provide legally mandated counseling as required by the provisions of the Prison Rape Elimination Act (PREA) for the benefit and protection of the plaintiff and subjected plaintiff to recurring psychological damage by failing to treat her ongoing psychological injuries arising from the sexual abuse.

In addition, plaintiff was subjected to unlawful full body cavity searches and suffered under unlawful conditions of confinement. Plaintiff is filing this suit in her own name but will be joined by another inmate who was also abused and assaulted by defendants Alberts and Battin. Plaintiff seeks declaratory and injunctive relief, nominal, compensatory and punitive damages, including reasonable costs, attorney's fees and disbursements, pursuant to 42 U.S.C. §1988.

## JURISDICTION AND VENUE

### 2.

Jurisdiction exists under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has jurisdiction over plaintiff's claims under 28 U.S.C. § 1343 because plaintiff has brought this action to seek redress for the deprivation of rights secured by the United States Constitution.

### 3.

Venue is proper under 28 U.S.C. § 1391(b)(2), because the acts and omissions alleged herein occurred in Washington County, Oregon. Further, one or more of the defendants reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

# PARTIES

### 4.

Plaintiff is a resident of Oregon and is an incarcerated individual. She presently resides in Oregon.

### 5.

Defendant Collette Peters was at all relevant times the Director for ODOC.  Defendant Peters has the ultimate oversight of ODOC employees and adults in custody (AIC) and is responsible for the enforcement and compliance with Federal law, including the United States Constitution and the mandates of the Prison Litigation Reform Act (PLRA), the Prison Rape Elimination Act of 2003 (PREA), and the laws of the State of Oregon. Defendant Peters approves and signs PREA audits for every ODOC institution in Oregon. She has implemented a zero-tolerance policy for sexually assaulting AICs within ODOC by employees of ODOC. Defendant Peters has had Governor Kate Brown certify to the United States government that Oregon is in compliance in all regards and meeting all of the requirements of PREA for compliance in order to continue to secure federal funding to the State of Oregon.

### 6.

Defendant Brian Belleque, until approximately May 1, 2019, was the Deputy Director for ODOC and responsible for carrying out and implementing all policies of the Director and the Policy Group. He was responsible for the overall safe and secure operation of all ODOC correctional institutions.

### 7.

Defendant Heidi Steward is the current Deputy Director of ODOC.  She has held this position since approximately April 1, 2019. Heidi Steward is responsible for carrying out and

implementing all policies of the Director and the Policy Group. She is responsible for the overall safe and secure operations of all ODOC correctional institutions. Defendant Heidi Steward was also the Assistant Director of Correctional Services.

**8.**

Defendant Michael Gower is the Assistant Director of Operations. He is the direct supervisor of every ODOC Superintendent within ODOC. Defendant Gower has the authority to direct and implement changes within ODOC prisons. He oversees the budgeting for each institution and approves budget requests for security improvements within ODOC. Defendant Gower is responsible for ensuring that Oregon prisons are safe, civil and productive. Additionally, Michael Gower is responsible for institutional management, AIC transportation, security threat group management, emergency preparedness and AIC work activities. Michael Gower, as Assistant Director of Operations, is responsible for PREA compliance and the safe and secure operation of ODOC Institutions.

**9.**

Defendant Rob Perrson is ODOC's Westside Institutions Administrator and is directly responsible to the operations of eight ODOC institutions including CCCF.

**10.**

Defendant Ericka Sage is the ODOC PREA Coordinator. As the PREA Coordinator she would pass along PREA audit recommendations to Defendants Peters, Belleque, Steward, Gower and the CCCF Superintendent and Assistant Superintendent of Security for CCCF for implementation.

**11.**

Defendant Paula Myers was Superintendent at CCCF during all relevant times.

**12.**

Defendant Stephen Alberts, Jr. was a correctional officer at CCCF at all relevant times.

**13.**

Defendant Jason Battin was a correctional officer at CCCF at all relevant times.

**14.**

Defendant Michael Yanez was a correctional officer at CCCF at all relevant times.

**15.**

Defendant Sherri Kilgore was a correctional officer at CCCF at all relevant times.

**16.**

Defendant Anthony Ross was a correctional officer at CCCF at all relevant times.

**17.**

Defendant Jack Rowlette was a correctional officer at CCCF at all relevant times.

**18.**

Defendant Tanya Simmons was a correctional officer at CCCF at all relevant times.

**19.**

Defendant Jennifer Elgin was an ODOC/CCCF counselor at all relevant times.

**20.**

Defendant T. Plumber was an ODOC SIU investigator at all relevant times.

**21.**

Defendant Alex M. Doran was and correctional officer at CCCF at all relevant times.

**22.**

Defendant Jason C. Wilson was a correctional officer at CCCF at all relevant times.

**23.**

Defendant Shannon Mecham was a correctional officer at CCCF at all relevant times.

**24.**

Defendant Michael S. Cranford was a correctional office at CCCF at all relevant times.

**25.**

Defendant Luise Finster was a correctional officer at CCCF at all relevant times.

**26.**

Defendant Doe was the Assistant Superintendent of Security at CCCF and was responsible along with the Superintendent for ensuring PREA compliance and that inmates were safe from sexual assault at CCCF.

**27.**

Defendants John and Jane Does are and have been Behavioral Health Services counselors at CCCF.

**28.**

Defendants John and Jane Does are security staff at CCCF who knew or should have known about Alberts' and Battin's behavior and unauthorized conduct.

**29.**

Defendant John and Jane Does are correctional officers at CCCF who facilitated, knew or should have known about Alberts' and Battin's behavior and unauthorized conduct.

**30.**

Defendant John and Jane Does are correctional officers at CCCF who facilitated and knew about Plaintiff's conditions of confinement and unlawful strip searches.

**31.**

Defendants John and Jane Does are and were at all times relevant, employees of ODOC and/or other state officials whose identities are currently unknown to Plaintiff. All Doe Defendants have been personally involved in the violations alleged herein. Plaintiff will amend this complaint to formally name all Doe Defendants once their identities are revealed to Plaintiff during discovery. All Doe Defendants are sued in the official and individual capacities. All Doe Defendants have acted under color of state law at all times relevant to this complaint.

**Exhaustion of Administrative Remedies**

**32.**

Plaintiff has exhausted all available administrative remedies with respect to all claims and all Defendants involved in the above-described events. Plaintiff also send a timely Notice of Tort Claim to Risk Management services with the State of Oregon.

**FACTUAL ALLEGATIONS**

**(Coffee Creek Correctional Facility)**

**33.**

Coffee Creek Correctional Facility (CCCF), located in Wilsonville, Oregon and is Oregon's only prison housing female AICs. It also serves as the intake center for all prisoners entering ODOC. The facility opened in 2001 and contains 1,684 beds.

**34.**

CCCF has cell and dormitory housing, work programs, skills training, treatment programs,

health services, religious service, physical plant, a central records unit and administrative areas.

**35.**

Since opening, CCCF has been the location of numerous sexual assaults, rapes and misconduct by staff against female AICs.

- 2004 – Lt. Jeffrey Allen Barcenas pled guilty to four counts of official misconduct for engaging in sex with a female AIC.

- 2008 – CO Richard Mitchell was female AICs to expose themselves to and engage in sexual favors with Mr. Mitchell.

- 2008 – CO Robert Dunlap was accused of abuse against a female AIC.

- 2009 – Mr. Paul Golden, CCCF employee was convicted of 15 counts of custodial sexual misconduct and the State was sued by the female AICs.

- 2009 – Mr. Richard Kaleo Rick, a civilian plumber working at CCCF, convicted and the state was prosecuted for sexually abusing AICs.

- 2009 – Mr. Troy Bryant Austin, a civilian maintenance worker at CCCF, was convicted and the state was sued for sexually abusing AICs.

- 2009 – CO Darcy Aaron MacKnight was convicted of custodial sexual misconduct for having sex with a female AIC.

- 2010 – Christopher Don Randall, Food Services Coordinator pled guilty to two counts of official misconduct for engaging in sexual intercourse with a female AIC.

- 2012 – Jeremy Joseph Veelle, Physical Plant employee a was charged with official misconduct for sexually abusing a female AIC.

- 2012 – Shawn Jacob Riley, a civilian employee at CCCF, arrested and charged with official misconduct and custodial sexual misconduct for sexual acts against a female AIC.

- 2016 – CO Edgar Mickels was arrested and charged with first degree sexual misconduct and three counts of custodial sexual misconduct for engaging in sexual contact with at least one female AIC.

- 2017 – CO Brian Joseph Balzer was convicted of first degree custodial sexual misconduct for his conduct with a female AIC at CCCF. Mr. Balzer's victim alleges there were other victims.

- 2017 – Dr. Robert W. Snider sued by three female AICs alleging they were sexually abused by Dr. Snider during unsupervised examinations while incarcerated at CCCF.

- 2019 – Tony Klien, ODOC nurse, at least 12 female AICs filed federal lawsuits against ODOC and several medical staff members for a long pattern of sexual grooming, assault, battery and retaliation for abuses committed by a male nurse.

- 2019 – Douglas Cloutier, ODOC kitchen employee, at least four female AICs filed complaints for sexual assault and battery against Mr. Cloutier.

## OREGON STATUTES

### 36.

Oregon Revised Statutes 423.020(1)(d) mandates the Oregon Department of Corrections to provide adequate food, clothing, health and medical care, sanitation and security for persons

confined.

**37.**

Oregon Revised Statutes 423.075(5)(d) states the Director of the Oregon Department of Corrections shall provide for the safety of all prisoners in the custody of the department.

**38.**

On August 20, 2012, the Department of Justice issued the final rule adopting national standards to prevent, detect, and respond to prison rape, as required by the Prison Rape Elimination Act of 2003 (PREA).

**39.**

ODOC has a zero-tolerance policy for sexual abuse. The Prison Rape Elimination Act of 2003 is a federal law that seeks to eliminate sexual assaults and sexual misconduct. This law applies to all federal and state prisons, jails, police lock-ups, private facilities, juvenile facilities, and community correctional settings. The Bureau of Justice Statistics carries out, annually, a comprehensive statistical review and analysis of the incidence and effects of prison rape. The major provisions of the standards are: General prevention planning, supervision and monitoring, cross gender searches and viewing, training and education, screening, reporting, responsiveness planning, investigations, discipline, medical and mental health, grievances, and audits. DOC continues its efforts to maintain safety for all inmates and others inside the facilities keeping PREA as a top priority. ODOC in inmate publications, handbooks, posters, fliers, and other types of communications with inmates has created an expectation that ODOC will do everything within its powers to protect inmates from staff assault and that ODOC expects inmates to be respected by staff at all times.

## PRISON RAPE ELIMINATION ACT

## (PREA)

### 40.

The Prison Rape Elimination Act (PREA) became federal law in 2003. The Oregon Department of Corrections adopted the mandates of PREA in Rule 40.1.13 and was modified in September 2018.

### 41.

PREA's purpose is to provide for the analysis of the incidence and effects of prison rape in federal, state and local institutions, and to provide information, resources, recommendations and funding to protect individuals from prison rape. PREA seeks to establish a zero-tolerance policy regarding rape and sexual abuse inside correctional facilities. PREA also mandated the publication of standards to ensure compliance and to improve prevention, detection and response strategies in addressing sexual abuse and assault.

### 42.

The requirements of ODOC Policy 40.1.13 and PREA include prevention, planning, investigation, prosecution, and provide counseling and treatment to victims. Oregon identifies itself as being committed to a zero-tolerance standard for sex abuse and sex harassment.

### 43.

The Agency PREA Coordinator is responsible for the development, implementation and oversight of the department's compliance with the PREA standards in all department facilities. Policy 40.1.13 II.A. In order for this coordination to occur the Operations Division, which Defendant Gower is in charge of, has to authorize the recommended implementation

recommendations. Without the adoption, cooperation on approval of the Operations Division, the Agency PREA Coordinator lacks authority to enact change.

**44.**

The PREA compliance manager is a management staff person designated by the institution functional unit manager, with sufficient time and authority to coordinate the facilities' efforts to comply with the federal PREA standards. (Policy 40.1.13 II.F.) However, absent the approval and direction of the Superintendent and Assistant Superintendent of Security, the PREA Compliance Manager lacks operational authority to make any changes or order anything to occur differently at an institution.

**45.**

Sexual abuse of an inmate by a staff member, contractor or volunteer includes any of the following acts, with or without consent of the inmate, detainee or resident:

1) Contact between the penis and vulva or the penis and anus including any degree of penetration;

2) Contact between the mouth, the penis, vulva or anus;

3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

4) Penetration of the anal or genital opening by hand, finger, object or other instrument, that is unrelated to official duties or where the staff member contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

5) Any other intentional contact, either directly or through the clothing, of

or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to the official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

6) Any attempt, threat, or request by a staff member, contractor of volunteer to engage in the activities described in this section;

7) Any display by a staff member, contractor or volunteer of his or her uncovered genitalia, buttocks or breast in the presence of an inmate, detainee or resident;

8) Voyeurism by a staff member, contractor or volunteer. (Policy 40.1.13.II.G)

**46.**

The sexual abuse liaison is a management staff person designated by the institution functional unit manager to coordinate response reporting and monitoring of inmate abuse within the institution. The sexual abuse liaison shall be assigned as the Sexual Abuse Response Team (SART) leader.

**47.**

The SART is a team of institution staff consisting of a Behavioral Health Services (BHS) staff member, a Medical Services staff member and the sexual abuse liaison who are designated by the functional unit manager to respond to all allegations of inmate sexual abuse or sexual coercion.

**48.**

All staff are covered by the mandates of PREA and Policy 40 including all ODOC employees, OCE employees, contract service providers and volunteers.

**49.**

ODOC Policy 40 mandates that all staff "must be able to recognize the signs of sexual abuse and sexual harassment and understand their responsibility in the detection, prevention, response and reporting of an alleged sexual abuse or sexual harassment."

**50.**

Each facility is required to conduct and document unannounced rounds on all shifts to deter staff sexual abuse and sexual harassment. Staff is prohibited from alerting other staff members that the supervisory rounds are occurring.

**51.**

ODOC shall ensure that each facility it operates develops and documents a staffing plan that provides for adequate levels of staffing to protect AICs against sexual abuse.

**52.**

Policy 40 mandates access to services, including reporting, for AIC victims of any and all sexual abuse or sexual harassment. Inmates who are found to have made "bad faith" allegations of sexual abuse will be held accountable through all means available to ODOC, including discipline. It is not known to plaintiff which ODOC staff members are properly trained in sexual abuse and misconduct investigations.

**53.**

Policy 40 mandates all staff to report "immediately any knowledge, suspicion or information regarding sexual abuse, sexual harassment, retaliation by inmate or staff for reporting or staff neglect or violation of responsibility that may have contributed to such incidents.

**54.**

Policy 40 sets forth the procedures to be followed when a complaint of sexual abuse or harassment is received. The PREA Compliance Manager shall be responsible for monitoring all inmates and staff to protect from retaliation or harassment by other staff or inmates. Typically, CCCF requests the Oregon State Police to conduct criminal investigations into allegations of sexual abuse inside the prison.

**55.**

ODOC states there is to be no long-term forfeiture of services and programs for victims of sexual abuse and that the safety of the victim is paramount. Inmates will be housed in the least restrictive housing, will have timely unimpeded access to emergency medical treatment, necessary post event treatment including coordination with community hospitals, testing for sexually transmitted diseases, comprehensive information and timely access to all lawful pregnancy related medical services, and referral to Behavior Health Services and communication with a designated sexual abuse liaison regarding further information required.

**56.**

Mental health services are required to be provided for victims of sexual abuse including timely, unimpeded access to appropriate mental health evaluation services without financial cost, comprehensive information on the limits of confidentiality and duty to report, completion of a mental health evaluation to include suicide risk screening, notification of the Officer in Charge and Medical Services regarding recommended actions, and follow up mental health services.

## RESPONSE TO PRIOR PREA INVESTIGATIONS

### 57.

Following the sexual abuse investigations noted in paragraph 29 above, many of the women victims were placed in segregation lost their jobs and/or housing, and were limited in visits with children and family. The superintendent for CCCF initiated an internal review which found that the facility had inadequate security patrols, rooms without windows or adequate surveillance, an overall shortage of surveillance cameras, and too many employees with access to limited private areas. The superintendent adopted a "Rule of Three" which prohibits entry into some parts of the prison unless three people—a mix of staff and inmates—are present.

### 58.

While neither PREA nor ODOC Policy 40 create a private right of action, national standards as implemented by the rule create duties expected of staff. Rights held by inmates create another protected "condition of confinement" which is protected under the Eighth Amendment to the United States Constitution. PREA and the state policy also creates notice to employees of expected performance and parameters of behavior which have the impact of law.

### Maria Molina

### 59.

On October 9, 2017, after pleading guilty to murder, plaintiff was transferred to Coffee Creek Correctional Facility (CCCF). Plaintiff entered CCCF custody when she was 22 years old. Upon arriving at CCCF, plaintiff was housed on K-Unit: an open dorm unit in the maximum/medium security building. At the same time, Correctional Officer (CO) Richard S. Alberts worked the K-Unit graveyard shift. It took Defendant Alberts approximately one day to begin grooming

plaintiff. It is clear by defendant Alberts' overt actions that he targeted plaintiff as soon as she entered ODOC custody. Plaintiff presented as the perfect target for a sexual predator: she was young, had been previously sexually abused, suffered significant trauma as a child and was facing a lifetime in prison.

**60.**

On or about October 10, 2017, while Plaintiff was assigned to K-Unit, defendant Alberts approached plaintiff and began flirting with her over trivial matters. Defendant Alberts commented on her relationships: he was critical of the letters plaintiff was writing and receiving, repeatedly asking who she was writing, and indicating that he was reading her correspondence to gain information about her. In another grooming move, defendant Alberts began to gain plaintiff's trust by stopping by her bunk for unusually long amounts of time to chat with her. He also started doing her favors regarding cell assignments.

**61.**

After targeting plaintiff and researching her life, defendant Alberts began securing access to her. Defendant Alberts' work schedule mirrored plaintiff's unit and work assignments. Defendant Alberts would pull plaintiff out of her cell and request that she do unscheduled orderly work.

**62.**

After approximately 30-days on K-Unit, plaintiff was transferred to G-Unit. While his post did not include duties on G-Unit, defendant Alberts would pick up G-Unit shifts, allowing him access to plaintiff. During this time, defendant Alberts continued to groom plaintiff by stopping by her cell in the morning to wake her up, wishing her a good day, telling her he was going to miss her and constantly staring at her while doing his rounds. All of these actions confused and scared

plaintiff.

**63.**

On April 28, 2018, plaintiff received a Disciplinary Rule (DR) violation and sanction. On or about May 23, 2018 she was placed in DSU. In response, defendant Alberts requested to work in DSU. In DSU, defendant Alberts had additional access to plaintiff and worked to further isolate her. Defendant Alberts continued to groom plaintiff with a consistent pattern of conduct: frequently sending her notes, telling her how beautiful she was, requesting deeper information about her and asking her to write about incriminating information. On the side, defendant Alberts was delving into plaintiff's files. It was clear that defendant Alberts accessed plaintiff's institutional and medical file because he knew about plaintiff's substance abuse issues.

**64.**

After defendant Alberts targeted plaintiff, he secured access to and gained her trust. Defendant Alberts then began sexually abusing her. The sexual abuse started when defendant Alberts *suggested* that plaintiff flash him her breasts and naked body during his rounds. Growing bolder, defendant Alberts demanded that plaintiff masturbate while he passed by her cell. Often defendant Alberts would stop in front of plaintiff's cell to watch her. At times, he would stand at her cell front and observe her combing her hair. To further ingratiate himself with plaintiff and ensure her silence and cooperation, defendant Alberts paid extra attention to plaintiff by complimenting her, giving her gifts, making promises, making sure that she got extra cake on her tray, getting her a radio, supplying her with extra books and increasing contact with her. Plaintiff was confused and uncomfortable doing the various acts of defendant Alberts.

**65.**

In June of 2018, plaintiff was transferred to C-Unit and defendant Alberts followed. While Alberts was still working a flex post he would choose to work in the C/D-Unit control point, known as the C/D bubble. Alberts' actions progressed to touching plaintiff at any opportunity.

**66.**

On August 6, 2018, plaintiff was disciplined and moved to DSU. Defendant Alberts followed and continued to work a flex schedule in DSU five days week. While plaintiff was in segregation, Alberts was able to access her much easier as security was lighter. Defendant Alberts consistently cultivated a sexual relationship with plaintiff by bringing her candy and food from the outside, giving her extra ice cream on Sundays and getting her puzzles. In DSU, Defendant Alberts continued to stand at plaintiff's cell front and observe her naked and masturbating.

**67.**

Defendant Alberts' actions occurred in the context of a highly sexualized environment where correctional officers are allowed to make unchecked, sexually charged and derogatory comments about female inmates' appearances. COs constantly commented on plaintiff's weight, asking her when the last time she stepped on a scale had been, and calling plaintiff by the name of an overweight AIC. Plaintiff endured constant remarks from correctional staff regarding her appearance.

**68.**

In August of 2018, plaintiff was moved to C-Unit and defendant Alberts' post changed to C-Unit; he was stationed in the bubble. Defendant Alberts was biding his time until October 2018, when he would be posted on C-Unit 5 days a week.

**69.**

Once posted on C-Unit, defendant Alberts pulled plaintiff off kitchen duty and reassigned her as an orderly. He rearranged her shift so they could work together. Defendant Alberts's actions progressed to grabbing plaintiff's breasts, buttocks, hands and crotch through the cuff port in her cell. He would make excuses to come see her in order to her in this manner. His actions were blatant. Defendant Alberts rarely made efforts to conceal the amount of time he was spending at plaintiff's cell front.

**70.**

Defendant Alberts' actions were clear to those who observed him. During this time, plaintiff was receiving DRs for having contraband in her possession. As a sanction, she would receive a loss of privilege (LOP). A LOP normally results in limited ability to access canteen and a requirement that the AIC stay in their cell for a sanctioned amount of time. However, defendant Alberts would consistently end plaintiff's LOP time early and allow her out of her cell. He would bring her fast food, chocolate, candy, and eventually a cell phone. AICs on C-Unit consistently made comments directly to defendant Alberts about his inappropriate actions. The overt nature of defendant Alberts' conduct was obvious and unstopped by CCCF correctional officials.

**71.**

Defendant Alberts graduated from grooming plaintiff to controlling her actions. In order to control her movements, defendant Alberts snuck a cell phone into plaintiff and got himself a disposable cell burner phone to stay in constant contact with her. On defendant Alberts' days off, he would require plaintiff to remain in her cell—on the phone—talking to him. When he returned to work, he would take the phone from her and check the history to ensure plaintiff was not using the phone to call any unapproved numbers. Defendant Alberts would threaten to take the phone

from her if she broke up with him or talked to other men. He further controlled her movements by indicating when, and if, she could go out to yard. He also controlled her appearance: telling her that she needed to dye her hair blonde, get her nails done and stay under 150 pounds.

**72.**

Plaintiff was not allowed video visits with certain people, and defendant Alberts would confiscate plaintiff's mail, read it and tell other COs and AICs the contents of the letters. Defendant Alberts would also show photos from the letters to others. During this time, Alberts was constantly searching plaintiff's cell, all of which went unrecorded.

**73.**

In mid-February 2019, Alberts arranged for a sexual encounter between defendant Jason Battin and plaintiff. Plaintiff was supposed to meet defendant Battin in the property room where they would have sexual intercourse. As plaintiff and defendant Battin were entering into the property room, they were stopped by defendant Darling. Defendant Darling called down to C-Unit—plaintiff's unit—and spoke to the officer on duty, defendant Alberts. Defendant Darling informed defendant Alberts that she was sending plaintiff back to the unit, as plaintiff was not supposed to be in the corridor leading to the property room. Meanwhile, defendant Battin mouthed to plaintiff to wait in the corridor until defendant Darling left. Defendant Battin was not adhering to the "Rule of Three" inmate-to-staff ratio because he was about to enter into the property room with plaintiff. Despite this, defendant Darling did not properly report this incident.

**74.**

The next day, defendant Alberts engaged in sexual intercourse with plaintiff in the staff bathroom located in the C/D-unit corridor. Defendant Battin acted as the lookout for defendant

Alberts.  After defendant Alberts was finished having sex with plaintiff, defendant Battin waved and smiled at plaintiff as she passed him in his lookout position. Plaintiff was embarrassed, ashamed and scared. While this corridor is monitored by master control, defendant Alberts was not reprimanded for his actions and plaintiff was not afforded a PREA advocate or counseling. Plaintiff believes that in text message obtained by the FBI, defendant Alberts reminded plaintiff, "I raped you once, don't make me rape you again."

**75.**

On March 20, 2019, defendant Alberts was caught by an AIC in plaintiff's cell, alone with plaintiff.  The AIC reported Alberts' actions to defendant Kilgore. This action was in violation of CCCF policy and should have resulted in an immediate PREA investigation.  Instead, defendant Kilgore failed to report the incident and defendant Alberts' actions and abuse continued unchecked.

**76.**

In the same month, defendant Alberts engaged in sexual intercourse with plaintiff a second time; on this occasion, the assault took place in the supply closest adjacent the upstairs showers on C-Unit. During this encounter, defendant Alberts required that another AIC, Mercedes Crabtree, sexually participate with him and plaintiff. It is our belief and understanding that CCCF/ODOC obtained the video recording of defendant Alberts, plaintiff and Ms. Crabtree entering and leaving the closet and throwing paper towels out of closet. Between February 14 – April 5, 2019, defendant Alberts and plaintiff had a sexual encounter every day that defendant Alberts worked. The sexual encounters included kissing, groping and fondling. Often times taking place in the upstairs storage closet. Plaintiff was powerless to stop these encounters.

**77.**

On or about May 2, 2019, an official investigation began into defendant Alberts' actions. He was transferred full time to O-Unit, a male housing unit. Prior to May 2, 2019, Alberts worked three days a week on C-Unit and two days a week on O-Unit. On May 2, 2019, Lieutenant Bucksmen interviewed plaintiff, Ms. Crabree and Alberts. Each denied defendant Alberts' illicit behavior. After the denial, despite having video evidence of the incidents and other reliable information, defendant Alberts was returned to his 2/3-day work schedule; alternating between C-Unit and O-Unit. In order keep his access to plaintiff, defendant Alberts traded with CO Doran for CO Doran's Wednesday shift in the C/D Unit bubble. Captain Yanez approved Alberts' shift change.

**78.**

On June 6, 2019, plaintiff was handcuffed, removed from general population, moved to segregation status and placed in the disciplinary hearing's office. There, she was accused of being pregnant by Oregon State Police and CCCF SIU. Plaintiff reports that she was strip searched, and her body cavities were checked for contraband. The pregnancy test that was administered was negative. The only way plaintiff could have become pregnant is via a PREA incident. Despite these suspicions, plaintiff was not offered or provided a PREA advocate or counseling.

**79.**

Plaintiff was placed on an administrative segregation hold and placed in the mental health infirmary (MHI). Also, on June 6, 2019, plaintiff was transferred from CCCF to the Oregon State Penitentiary in Salem, Oregon. There, plaintiff underwent a body scan using a seated metal detector designed to detect objects hidden in the mouth, abdomen, anus or vagina. Although plaintiff's medical records indicate differently, however there was no indication that any metal

objects were detected inside plaintiff. Plaintiff arrived back at CCCF at 10:00 p.m. and was not afforded anything to eat. Every four hours, plaintiff was strip searched; SIU demanded she remove the cellphone from her vagina. Plaintiff insisted that she had not internally sequestered electronics in her body cavity. In addition to constant strip searches, plaintiff was kept in a dry cell.

**80.**

On June 7, 2019, plaintiff was taken to the Washington County Jail where she underwent another full body scan. Upon arrival back at CCCF, A CCCF nurse counseled plaintiff, insisting that if there was something in her body, it could explode if not removed. Plaintiff explained the physical impossibility of hiding a cell phone in her vaginal cavity. Despite having been through two metal detectors, in a dry cell, housed in a close supervision cell and subjected to numerous strip searches, plaintiff was transported to Meridian Park Hospital. SIU continued with their irrational and unsupported belief that plaintiff had hid electronics inside her.

**81.**

Plaintiff became visibly upset with SIU for forcing her to undergo multiple x-rays and a transport to Meridian Park for a cavity search. Once at Meridian Park, plaintiff was put through an x-ray machine. The x-ray did not detect any metal objects. She was then asked to consent to a vaginal and rectal examination. Plaintiff was told she had to consent, or she would be placed back in a dry cell. After refusing to consent to the vaginal and rectal exam, plaintiff was transported back to CCCF and placed in a dry cell, per Captain Yanez.

**82.**

Plaintiff was not given food on June 7th or June 8th and was not afforded a shower. Plaintiff understood that this was an order from Captain Rose, a higher up. In response, plaintiff refused to eat until she was allowed to shower. Plaintiff was not allowed to shower for 14 days and as such,

she refused to eat for 14 days. (*Attachment 8, ODOC medical log, p. 1-2, assessed for suicide after skipping 13 meals in a row*.) Compounding CCCF/ODOC's refusal to allow plaintiff to shower, CCCF/ODOC officials denied plaintiff yard time and housed her in inhumane conditions. Plaintiff sent at least two grievances regarding her lack of adequate nutrition, shower and yard time. She went on three different hunger strikes, the basis for which was staff's refusal to allow her to shower and use the yard. The longest strike occurred in June of 2019 and totaled 14 days. She was allowed to shower on June 21, 2019.

**83.**

In addition to the cruel and unusual punishment of her living situation, plaintiff was not afforded the opportunity to contact an attorney. When plaintiff's child custody attorney called, plaintiff was not afforded confidential communication with him. During this attorney/client phone call, COs Finster and Mecham used the speaker phone option to monitor her conversation. Plaintiff notified CCCF superintendent of this breach of her constitutional rights. Plaintiff exhausted her administrative remedies by filing kytes. Any further form of grieving her conditioners was denied by CCCF staff.

**84.**

CCCF staff stopped all of plaintiff's out-going legal mail. She was only allowed to speak to her dependency attorney, if he phoned her. Plaintiff was not allowed legal calls out. The limitation on her communication extended to a complete denial of any written or oral communication between her and her family, friends or court. Her communication with the outside world was extinguished.

**85.**

To add an increased constitutional deprivation, CO Rowlette would taunt her by singing

altered lyrics of the popular song "Wasn't Me" by Shaggy: "caught on camera? not me," "caught in the closet? Not me." CO Rowlette's remarks indicate that CCCF staff knew of CO Albert's illegal relationship with plaintiff. Despite this plaintiff was not afforded a PREA advocate or required counseling.

### 86.

On or about June 20, 2019, plaintiff was moved from the close-supervision cell to the infirmary. She was placed in complete isolation—no clock, no windows—a long hallway and four doors separated her from the inmates in general population, and two doors separated her from staff and CCCF personnel. Plaintiff was alone with only a staticky radio. She was allowed books from the book cart and puzzles, but she was locked down 24 hours a day without consistent time on the yard. On some occasions she would be afforded yard time, but a constant dispute between correctional staff in the infirmary and segregation-correctional staff resulted in no one wanting to take responsibility for plaintiff. Many times, neither MHI staff or segregation staff would take plaintiff to shower or to the yard. Plaintiff began another hunger strike to get her mail. The successful five-day hunger strike resulted in plaintiff receiving 18 weeks' worth of mail.

### 87.

By October of 2019, plaintiff was still in complete isolation in her makeshift DSU cell, located in the depths of MHI. She continued to struggle for time out of her cell. She was not allowed yard time for 22 days in October of 2019.

### 88.

On November 14, 2019, at approximately 9:00 p.m., Corporal Cramford appeared outside plaintiff's cell with a pregnant AIC. In an attempt to humiliate and dehumanize plaintiff, Corporal Cramford asked the pregnant AIC if defendant Alberts was the father of her baby. Plaintiff became

very upset and requested to speak with Lt. Allen. Corporal Cramford's actions reverberated and played a role in Ms. Molina's serious suicide attempt on November 15, 2019. Corporal Cramford's remarks indicate that CCCF staff knew of defendant Albert's illegal relationship with plaintiff. Despite this, plaintiff was not afforded a PREA advocate or required counseling.

**89.**

Still in isolation and threatened by SIU, plaintiff agreed to speak to the FBI. On November 15, 2019, the FBI arrived and read plaintiff her Miranda Rights. She refused to cooperate. During her time in segregation, plaintiff's mail and possessions were being held. She could not access the addresses she needed to request help. Plaintiff was unable to contact an attorney as she did not have access to a phone or phonebook. Prison administration did not assist in helping her contact an attorney or other advocate. Lt. Allen attempted to persuade upper management to allow plaintiff access to an attorney. Lt. Allen reported that his request was denied.

**90.**

On November 15, 2019, plaintiff was feeling scared, anxious, hopeless and alone; she began to write good-bye letters to her children and family. Once finished, she tied her sports bra around her neck and attempted suicide. The suicide attempt was the result of a combination of effects: utter isolation, anxiety, and stress, combined with demoralizing and degrading comments made by Corporal Cramford. Plaintiff was found unresponsive in her bed, cloth still tied around her neck. She was revived and 911 was called; ligature marks were noted. She was transported to Meridian Park for medical treatment. This attempt was classified as a serious suicide attempt. Her good-bye letters to her family were confiscated and never returned to her.

**91.**

On November 18, 2019, ODOC acknowledged that contraband was introduced into the

institution by correctional staff. Despite this acknowledgement, on November 22, 2019, plaintiff had a DR hearing where she was sanctioned to 120 days (with upward deviation to 180 days) in DSU as punishment for racketeering, contraband, possession of drugs, distribution, possession of an electronic device, and misuse of an information system (using Telemate to gain financially). This sanction came with 14 days LOP, a $100 fine, and visits behind glass for 730 days.

## 92.

Plaintiff was inappropriately sanctioned for the actions of a correctional officer. A correctional officer who forced plaintiff to engage in criminal activity or face physical, sexual and emotional harm. Plaintiff's DSU sanction had a start date of June 6, 2019 and an end date of December 2, 2019.

## 93.

After the hearing, plaintiff was moved to the Disciplinary Segregation Unit (DSU) where she remained until January 16, 2020. Plaintiff was not afforded a PREA advocate or counseling until December 3, 2019—180 days after she was given the pregnancy test. Instead, plaintiff was required to participate in BHS class, as mandated by BHU counselor, Schmidt. Throughout plaintiff's time in segregation and DSU, Captain Wilson implored her not to talk to anyone about Alberts' actions, specifically, Lt. Allen.

## 94.

On January 16, 2020, plaintiff was transferred from CCCF to the Grant County Jail.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Cruel and Unusual Punishment – Sexual Battery**

**42 U.S.C § 1983 – Violation of Eighth Amendment**

**(Defendants Alberts and Battin)**

**95.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 88, and incorporates those allegations herein by this reference.

**96.**

Sexual assault on an inmate is deeply offensive to human dignity and is cruel and unusual punishment under the Eighth Amendment. AICs have a clearly established Eighth Amendment right to be free from sexual abuse. Sexual abuse of an inmate also constitutes excessive force and violates the Due Process Clause of the Fourteenth Amendment.

**97.**

Plaintiff is entitled to be held in a safe and humane conditions of confinement throughout her incarceration. Plaintiff is entitled to be free from unwanted and unwarranted sexual touching and abuse. She is entitled to her own personal bodily integrity pursuant to the parameters of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff is also entitled to a to be safe and secure from undue and excessive force while in custody.

**98.**

The acts and omissions of defendants Alberts and Battin violated plaintiff's protected rights and were an excessive intrusion onto her person without just cause and amounted to deliberate

indifference to plaintiff's protected rights and her own personal safety. Defendants violated the requirements of the Eighth and Fourteenth Amendment rights held by plaintiff through the use of excessive force, intentional and abusive sexual assault and subjecting her to unsafe and inhumane conditions of confinement.

**99.**

The specific acts of defendants Battin and Alberts individually and alleged to be deliberately indifferent are more particularly set forth below:

1) Defendant Battin attempted to physically restrain, sexually touch or cause serious bodily harm and significant mental distress to plaintiff. The actions of defendant Battin against plaintiff occurred in February 2019.

2) Defendant Alberts physically restrained, sexually touched or caused serious bodily harm and significant mental distress to plaintiff. The actions of defendant Alberts against plaintiff occurred between October 2017 to June of 2019.

3) The actions of defendant Alberts violated every definition of sexual abuse of an inmate by a staff member as set forth in ODOC Policy 40.1.13.II.G.

4) The actions of defendant Battin violated at least one of the enumerated definitions of sexual abuse of an inmate by a staff member as set forth in ODOC Policy 40.1.13.II.G.

5) The actions of defendants Alberts and Battin were in violation of existing correctional standards, the United States Constitution, and state and federal laws and rules.

**100.**

Defendant Alberts violated all of the enumerated acts of sexual abuse against plaintiff. Defendant Alberts used his position of power to abuse plaintiff, a vulnerable victim trapped under his supervision. Defendant Alberts' actions were not only criminal but also placed plaintiff, as well as other inmates and correctional staff, in harm's way. Defendant Battin sexually abused plaintiff in his attempt to engage in numerous prohibited sexual contacts.

**101.**

Defendants Peters, Belleque, Gower, Steward and Perrson know of various technology security solutions that would aid in the prevention and deterrence of sexual assault in prisons. Technology exists to allow correctional facilities to track inmate and staff movement around the clock. The system alerts the institution if a staff member were alone with an inmate within a particular area of the institution. This system would have easily monitored defendant Alberts and Battin's movements within CCCF.

**102.**

Defendants violated clearly established rights and no reasonable official similarly situated to defendants could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendants lack qualified or statutory immunity from suit or liability.

**103.**

As a result of the violations of the Constitutional standards set forth herein, Plaintiff suffered physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. She was isolated, helpless and disregarded. As a result of the violations of the Constitutional standards set forth herein, Plaintiff has suffered from forms of stress, depression,

anxiety and an exacerbation of her underlying problems from early sexual abuse. The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated Plaintiff's right under the Eighth Amendment to the United States Constitution.

**104.**

As a result of the violations of the Constitutional standards set forth herein, plaintiff continues to suffer from anxiety, stress, anger, hopelessness, depression and ongoing battles with stress.

**105.**

As a result of the violations of the Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,523,622.61. Plaintiff seeks punitive damages against defendants.

**106.**

All defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct both below the standard prescribed by law herein but also was illegal.

**SECOND CLAIM FOR RELIEF**

**Deprivation of Federal Civil Rights**

**Cruel and Unusual Punishment**

**Unlawful Strip Searches**

**(T. Plumbers and Does)**

**107.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 98, and incorporates those allegations herein by this reference.

**108.**

On June 6, 2019, plaintiff was placed in a close supervision dry cell, meaning that her movements were constantly monitored by a correctional officer sitting outside her cell and by a camera equipped in her cell. The cell was not equipped with water and she used a commode equipped with a plastic bag to collect her urine and feces for inspection.

**109.**

OAR 219-041-0020 provides that AICs may be subject to search at any time; "but not more frequently than is necessary to control contraband or to recover stolen or missing property..."

**110.**

By report, Between June 6, 2019 and June 8, 2019 Plaintiff was subjected to the following:

1) June 6, 2019 at approximately 2:00 p.m. – 1st Body Cavity Strip Search. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by two female COs , an ODOC nurse and female SIU investigators;

2) June 6, 2019 at approximately 2:00 p.m. Plaintiff was required to take two pregnancy tests, urinating onto a pregnancy test. Visual inspection of her taking the pregnancy test required by two female CO's, an ODOC nurse and a female SIU investigator.

3) June 6, 2019 at approximately 5:00 p.m. - **1st Full Body Scan**. Plaintiff was subjected to a full body scan at Oregon State Penitentiary.

4) June 6, 2019 at approximately 10:00 p.m. - **2nd Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer.

Plaintiff was also required to urinate and defecate into a commode equipped with a plastic for collection.

5) June 7, 2019 at approximately 2:00 a.m. - **3rd Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was required to urinate and defecate into a commode equipped with a plastic bag for collection.

6) June 7, 2019 at approximately 6:00 a.m. - **4th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was required to urinate and defecate into a commode equipped with a plastic bag for collection.

7) June 7, 2019 at approximately 10:00 a.m. - **5th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was also required to urinate and defecate into a commode equipped with a plastic bag for collection.

8) June 7, 2019 - **2nd Full Body Scan**. Plaintiff was transported to the Washington County Jail for Full Body Scan. No metal objects detected.

9) June 7, 2019 at approximately 10:00 a.m. - **6th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff

was also required to urinate and defecate into a commode equipped with a plastic for collection.

10) June 7, 2019 - **3rd Full Body Scan**. Plaintiff was transported to Meridian Park Hospital for an x-ray to detect metal objects. By information and belief, no metal object detected.

11) June 7, 2019 upon arrival back at CCCF - **7th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was also required to urinate and defecate into a commode equipped with a plastic for collection.

12) June 7, 2019 at approximately 10:00 p.m. - **8th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was also required to urinate and defecate into a commode equipped with a plastic for collection.

13) June 8, 2019 at approximately 2:00 a.m. - **9th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was also required to urinate and defecate into a commode equipped with a plastic for collection.

14) June 8, 2019 at approximately 6:00 a.m. – **10th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff

was also required to urinate and defecate into a commode equipped with a plastic for collection.

15) June 8, 2019 at approximately 10:00 a.m. - **11th Full Body Cavity Search**. Naked, plaintiff was required to bend over, cough, and spread her buttocks and vagina for visual inspection by a female correctional officer. Plaintiff was also required to urinate and defecate into a commode equipped with a plastic for collection.

## 104.

As a result of the violations of the Constitutional standards set forth herein, plaintiff suffered forcible, non-consensual and physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. Plaintiff suffered extreme fear while the assaults were occurring which was made worse because she knew or believed that no one would stop the strip and cavity searches. She was isolated, helpless and disregarded. As a result of the violations of the Constitutional standards set forth herein, plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early sexual abuse.

## 105.

Defendants used constant strip and cavity searches to punish plaintiff.

## 106.

As a result of the violations of the Constitutional standards set forth herein, plaintiff continues to suffer from post-traumatic anxiety, stress, anger, hopelessness, depression, fear, shame, ongoing battles with stress, and loss and deprivation of plaintiff's liberty.

**107.**

All defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein. Defendants violated clearly established rights and no reasonable official similarly situated to Defendants could have believed that his or her conduct was lawful or within the bounds of reasonable discretion. Defendants lack qualified or statutory immunity from suit or liability.

**108.**

As a result of the violations of the Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $10,000.00 per unlawful strip search Plaintiff seeks punitive damages against defendants.

**109.**

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**THIRD CLAIM FOR RELEIF**

**Deprivation of Federal Civil Rights**

**Cruel and Unusual Punishment**

**Conditions of Confinement**

**(42 U.S.C § 1983 — Violation of Eighth Amendment)**

**(T. Plumber, Wilson, Rose, Finster, Mecham, Cramford, Rowlette, Does)**

**110.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 109, and incorporates those allegations herein by this reference.

**111.**

As a state prisoner, plaintiff has an Eighth Amendment right to be free from cruel and unusual punishments. Defendants are responsible for providing plaintiff with appropriate conditions of confinement that do not subject plaintiff to substantial risk of serious harm. Conditions of confinement must comply with applicable law and policies protecting plaintiff's health and safety.

**112.**

Plaintiff's confinement was indefinite and abnormally harsh, causing her atypical and significant hardship and thereby violated her Eighth Amendment rights. Correctional officials are required to provide personal hygiene, outside exercise, and adequate food and water to AICs. Here, upon information and belief, plaintiff was deprived of these basic needs as well as the means to communicate with anyone about these deprivations.

**113.**

Plaintiff's placement in the back of the infirmary was motivated to deprive her of all basic human dignities until she cooperated with law enforcement. She was denied "the minimal civilized measure of life's necessities…" to such an extent that she attempted to take her own life. These deprivations indicate the cruelest of intentions and violation of her Eighth Amendment rights.

**114.**

Defendants Plumber, Rose, Wilson, Finster, Mecham, Cramford, Rowlette, Peters, Myers, Steward, and Gower participated or had knowledge of the conditions of confinement plaintiff was subjected to and failed to take action.

**115.**

As a direct and proximate result of the actions described herein, plaintiff sustained actual damages, including harm from prolonged isolation, worsening of suicidal ideation, fear, anxiety, and shame, and loss and deprivation of plaintiff's liberty.

**116.**

As a result of the violations of the Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $$5,523,622.61. Plaintiff seeks punitive damages against defendants.

**117.**

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**FOURTH CLAIM FOR RELIEF**

**Deprivation of Federal Civil Right**

**Failure to Protect**

**(42 U.S.C §§ 1983, 1985)**

**(All Defendants)**

**118.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 117, and incorporates those allegations herein by this reference.

**119.**

Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and

threats to her safety and security under the laws of the State of Oregon and the Eighth Amendment to the United States Constitution.

**120.**

Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault including rape, providing protection to vulnerable inmates, and to comply with all aspects of intervening and providing a safe environment to plaintiff.

**121.**

Defendants violated the Constitutional and statutory rights held by plaintiff in the following ways:

1) ODOC/CCCF's failure to timely investigate defendant Alberts' actions;

2) ODOC/CCCF's failure to timely investigate defendant Battin's actions;

3) ODOC/CCCF's failure to provide adequate supervision and training for staff;

4) ODOC/CCCF's failure to provide adequate safeguards and protections for AICS from defendants Alberts and Battin;

5) ODOC/CCCF's failure to respond to obvious signs that defendant Alberts was grooming plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

6) ODOC/CCCF's failure to respond to obvious signs that defendant Battin was attempting to sexually abuse plaintiff, and displayed sexual predator

patterns which were known to many staff members including security staff and management at CCCF;

7) ODOC/CCCF's failure to provide legally mandated counseling as required by provisions of the PREA for the benefit and protection of plaintiff;

8) ODOC/CCCF's lack of concern for security and premises defects at CCCF. Defendant's Alberts and Battin had access to various secluded areas of CCCF that were known as areas of illegal activity and were not equipped with adequate and properly placed monitoring systems;

9) ODOC/CCCF's knowledge of defendant Alberts' actions and their failure to take immediate action to stop defendant Alberts' actions;

10) ODOC/CCCF's knowledge of actions and their failure to take immediate action to stop defendant Battin's actions;

11) OCOD/CCCF's failure to protect plaintiff from sexual harassment and intimidation from correctional officers;

12) ODOC/CCCF's failure to preserve evidence of defendant Alberts' actions, by failing to preserve video surveillance of C-Unit, D-Unit and the staff bathroom;

13) ODOC/CCCF's failure to comply with the mandates set forth in PREA, including but not limited to meeting with plaintiff 30, 60, and 90 days after the incident;

14) ODOC/CCCF's failure to comply with the mandates set forth in PREA, including but not limited to advising plaintiff that she could have an

advocate present during all interviews;

15) ODOC/CCCF's punishment of plaintiff for actions of corrupt correctional officers;

16) ODOC/CCCF's unwarranted strip searches of plaintiff;

17) ODOC/CCCF's failure to ensure that plaintiff's conditions of confinement complied with constitutional standards.

**122.**

As a result of the behaviors of the defendants herein plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, could not meet with advocates, was denied abuse counseling, could not safely access medical care, could not safely access legal counsel, was housed in inhumane conditions, suffered repeated verbal abuse and her underlying anxiety and PTSD were severely exacerbated.

**123.**

As a result of the violations of the Constitution, Plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no lesss than $$5,523,622.61. Plaintiff seeks punitive damages against defendants.

**124.**

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

## FIFTH CLAIM FOR RELIEF

## Deprivation of Federal Civil Right

## Failure to Supervise

## (42 U.S.C §§ 1983, 1985)

## (Sage, Belleque, Peters, Gower, Doran, Rose, Wilson, Steward, Myer, Doe Defendant

## Assistant Superintended of Security at CCCF, Doe Defendants)

### 125.

Plaintiff re-alleges each and every allegation of paragraphs 1 through 124, and incorporates those allegations herein by this reference.

### 126.

The constitutional deprivations suffered by plaintiff are the proximate and direct cause of a non-interested, indifferent, and willfully ignorant supervisory practice by the named defendants. The supervisors have a constitutional duty to protect prisoners and to provide them with safe and humane conditions of confinement including the right to be free from sexual abuse and assault by staff. This duty imposed on supervisory staff includes the obligation under the law to fully investigate claims of sexual misconduct by staff against prisoners, the mandatory duty to report and address claims of sexual assault on prisoners, the duty to maintain a good and constant supervision of male staff supervising female prisoners, and the duty to ensure that AICs are held in constitutionally adequate conditions. The duty is enhanced when the prisoner population is especially vulnerable particularly if they are smaller, physically weaker, more vulnerable because of past sexual abuse and their ability to be easily abused.

### 127.

The constitutional deprivations committed by the supervisory staff were long-standing and

in the face of several years of obvious and notable signs about the predatory habits of defendant's Alberts and Battin, such as their ability to set their own schedules, roam the facility at will, pull inmates from their housing units during off hours, have unchaperoned access to women, exhibiting sexualized behaviors, their failure to follow recommended guidelines for interactions with AICs, their lack of accountability, numerous rumors and innuendo, and a complete lack of investigation and follow up.

**128.**

The supervisory staff failed in the following particulars:

1)     Failed to implement adequate inmate monitoring and managing process after the repeated sexual violations at CCCF noted above;

2)     Failed to provide adequate safeguards to keep inmates from meeting alone with staff;

3)     Failed to note and respond to evidence of abuse;

4)     Refused to take action because they purposefully disregarded the complaints of prisoners, did not believe anyone would care about the wellbeing of the prisoners, did not believe anyone would believe prisoners, and generally allowed defendant Alberts to thrive in plain sight;

5)     Treated the prisoners as if they deserved the abuse they received. If any one of the supervisory staff had followed through on the complaints and obvious signs of abuse, the plaintiff in this action would not have been sexually assaulted or abused;

6)     Tolerated if not encouraged an atmosphere of bullying, threatening and retaliating against inmates who came forward with concerns about the

sexual behavior of staff;

7) Tolerated and encouraged staff to take proactive measures to discourage complaints about sexual behaviors;

8) Refused to allow plaintiff access to legal mail and legal counselors, searched legal mail, instructed grievances to be denied and delayed for arbitrary reasons; Supervisors have taken an informal policy approach that the staff members are more important than prisoners and must be protected from any and all complaints by prisoners; and

9) Issued orders that the victim of defendant's Alberts and Battin would not receive the guarantees of federal and state law including mental health counseling, access to their chosen PREA advocate or adequate conditions of confinement.

**129.**

Furthermore, the supervisory staff failed plaintiff by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, and failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

**130.**

As a result of the unconstitutional practice by supervisors which was promoted, allowed or facilitated within CCCF, female informants, witnesses or victims of sexual abuse were ignored, or retaliated against for filing complaints of sexual abuse.

## SIXTH CLAIM FOR RELEIF

## Deprivation of Federal Civil Right

## Failure to Protect, Cruel and Unusual Punishment, and CCCF's liability for the actions of its employees

## (42 U.S.C § 1983 – Violation of Eighth Amendment)

### 131.

Plaintiff realleges all previous paragraphs and incorporates those allegations set forth herein.

### 132.

Defendants have deprived plaintiff of her constitutional rights within the meaning of Section 1983 when they participated in defendant Alberts' and Battin's affirmative acts of sexual abuse against plaintiff, and when they omitted performing an act which they are legally required to do that causes the deprivation.

### 133.

Here, CCCF/ODOC officials had knowledge of, ignored, acquiesced and facilitated the unconstitutional action of subordinate officials and correctional officers. Specifically, ODOC/CCCF's liabilities are as follows:

1) ODOC / CCCF's failure to timely investigate defendant Alberts' actions;

2) ODOC/CCCF's failure to timely investigate defendant Battin's actions;

3) ODOC/CCCF's failure to provide adequate supervision and training for staff;

4) ODOC/CCCF's failure to provide adequate safeguards and protections for inmates from defendant Alberts;

5) ODOC/CCCF's failure to provide adequate safeguards and protections for inmates from defendant Battin;

6) ODOC/CCCF's failure to respond to obvious signs that defendant Alberts was grooming plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

7) ODOC/CCCF's failure to respond to obvious signs that defendant Battin was attempting to sexually abuse plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

8) ODOC/CCCF's failure to provide legally mandated counseling as required by the provisions of the PREA for the benefit and protection of plaintiff;

9) ODOC/CCCF's lack of concern for security and premises defects at CCCF. Defendant's Alberts and Battin had access to various secluded areas of CCCF that were known as areas of illegal activity and were not equipped with adequate and properly placed monitoring systems;

10) ODOC/CCCF's knowledge of defendant Alberts' actions and their failure to take immediate action to stop defendant Alberts' actions;

11) ODOC/CCCF's knowledge of actions and their failure to take immediate action to stop defendant Battin's actions;

12) ODOC/CCCF's failure to protect plaintiff from sexual harassment and intimidation from correctional officers;

13) ODOC/CCCF's failure to preserve evidence of defendant Alberts' actions, by failing to preserve video surveillance of C-Unit, D-Unit and the staff bathroom;

14) ODOC/CCCF's failure to comply with the mandates set forth in PREA, including but not limited to meeting with plaintiff 30, 60, and 90 days after the incident.

15) ODOC/CCCF's failure to comply with the mandates set forth in PREA, including but not limited to advising plaintiff that she could have an advocate present during all interviews.

16) ODOC/CCCF's punishment of plaintiff for the actions of corrupt correctional officers.

**134.**

The deprivations committed by the supervisory staff was longstanding and in the face of several years of obvious and notable signs about the predatory habits of defendants Alberts and Battin, and their ability to set their own schedule, roam the facility at will, pull inmates from their housing units during off hours, have access to women without chaperones, exhibition of sexualized behaviors, failure to follow recommended guidelines for interactions with prisoners, lack of accountability, numerous rumors and innuendos, and a lack of investigation and follow-up.

**135.**

Furthermore, the supervisory staff failed plaintiff by failing to institute national standards

for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, and failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

### 136.

As a result of the practices by ODOC supervisors—which were promoted, allowed, or facilitated within CCCF—female informants, witnesses or victims of sexual abuse were ignored, punished or retaliated against for filing complaints of sexual abuse. As a result of the behaviors of the defendants herein, plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, feared meeting with advocates, was denied abuse counseling, could not safely access medical care, was held in unlawful conditions, subjected to unlawful strip searches and her underlying anxiety and PTSD were severely exacerbated.


### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully prays that this Court will enter a Judgment in her favor, and against defendants, as follows:

A. Finding that any or all defendants violated her protected Constitutional rights;

B. Findings that as a result of the Constitutional violations alleged herein Plaintiff has sustained harm and damages in an amount no less than $5,523,622.61;

C.     Findings that the cause of the constitutional violations is intentional or so grossly and deliberately indifferent to justify the award of punitive damages against each named defendant in a sum no less than $100,000.00 each;

D.     Findings that plaintiff was subject to sexual assault as a result of the actions of individual in the employment of the State of Oregon;

E.     Findings that plaintiff was the subject to unlawful strip and cavity searches;

F.     Finding that as a result of the unconstitutional violations alleged herein, Plaintiff has sustained harm and damages in an amount no less than $10,000.00 per illegal search;

G.     Findings that plaintiff was held in unlawful conditions of confinement;

H.     For an award of economic and noneconomic damages in an amount to be proven at trial, but not less than $5,523,622.61;

I.     For an award of punitive damages in an amount to be proven at trial;

J.     Injunctive relief, ordering defendants and their agents and employees, to require that plaintiff remain in Oregon for the balance of her incarceration;

K.     For plaintiff's reasonable attorney fees, costs, and disbursements; and

L.     For such other relief as the law permits and justice requires.

DATED this 22nd day of July, 2020.

Respectfully submitted,

/s/ Ginger G. Mooney
Ginger G. Mooney, OSB#: 031261
Attorney for Plaintiff